1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10   ALPENSPRUCE EDUCATION                     CASE NO. C23-692 MJP
     SOLUTIONS INC.,

11                                             ORDER ON CROSS-MOTIONS
                       Plaintiff,             FOR SUMMARY JUDGMENT
12                                             AND MOTIONS TO EXCLUDE
            v.
13
     CASCADE PARENT LIMITED; and
14   PARALLELS INC.,

15                     Defendants.

16

17

18          This matter comes before the Court on the Parties' Cross-Motions for Summary

19   Judgment (Dkt. Nos. 63, 84) and Motions to Exclude (Dkt. Nos. 58, 72, 77, 92). Having

20   reviewed the Motions, the Responses (Dkt. Nos. 103, 110, 113, 119, 121, 122), the Replies (Dkt.

21   Nos. 123, 125, 127, 129, 130, 134), and all supporting materials, and having held oral argument

22   on February 27, 2025, the Court DENIES the Cross-Motions and DENIES the Motions to

23   Exclude, except as to certain limited opinions from Drew Voth, Jason Roos, and Jennifer

24   Vanderhart.

**BACKGROUND**

Plaintiff Alpenspruce Education Solutions, Inc. "is a technology services firm serving school districts across the United States [that] . . . provides a professional development software platform for online and blended learning." (Am. Compl. ¶ 15; see Declaration of Damon Torgerson ¶¶ 7, 17 (Dkt. No. 66).) Since 2017, Plaintiff has marketed and sold this software platform to school districts through the name "Alludo", which obtained trademark status in 2018 from the U.S. Patent and Trademark Office. (Torgerson Decl. ¶¶ 19-20.) Plaintiff accuses Defendants Cascade Parent Limited and Parallels Inc., an international software company, of infringing on the Alludo trademark (herein ALLUDO) after they rebranded from "Corel" to "Alludo" in 2022. Plaintiff pursues claims for: (1) trademark infringement in violation of 15 U.S.C. § 1114; (2) unfair competition and false designation in violation of 15 U.S.C. § 1125; (3) common law trademark infringement; (4) violations of the Washington Consumer Protection Act; and (5) unjust enrichment.

**A.    Plaintiff's Brand & the Mark**

Plaintiff's ALLUDO product is an online platform that provides gamified professional development training for K-12 educators and school administrators. (Torgerson Decl. ¶¶ 13-14, 17, 48-50; Torgerson Dep. at 91, 96 (Declaration of Bruce Ratain Decl. Ex. A (Dkt. No. 83-1)).) The training offered is varied, and includes, among other things, instructional tools, curriculum development, and cyber security, as well as training on specific technologies, such as Microsoft Office, Adobe Photoshop, and Google productivity software. (Declaration of Christopher Mayer ¶ 20 and Ex. 9.) Although Plaintiff's counsel stated at oral argument that ALLUDO provides training on Defendants' software, the Court is aware of no evidence to support this contention. (See Transcript of Hearing at 46 (Dkt. No. 143).)

1    Plaintiff spent a number of months selecting the name ALLUDO for its software

2    platform, and registered a web domain, www.alludolearning.com, in July 2017. (Torgerson ¶¶

3    26-27.) Plaintiff was unwilling to spend $25,000 for the web domain www.alludo.com, but it did

4    acquire other "top level" domains associated with the name ALLUDO. (Id. ¶¶ 27-29.) In July

5    2017, Plaintiff filed a trademark application with the USPTO for ALLUDO for "providing on-

6    line non-downloadable software for developing skills through goal setting, goal tracking, and

7    competition with other users." (Torgerson Dec. ¶ 19; Mayer Dec. ¶ 6.) The application

8    "matured" on April 17, 2018. (Torgerson Decl. ¶ 20.)

9    Over the course of the last seven years, Plaintiff has gained over 5,000 schools with

10   142,000 end-users of the ALLUDO platform. (Torgerson Decl. ¶ 49.) Plaintiff has marketed

11   ALLUDO to K-12 educators, schools, and administrators through word-of-mouth, web

12   advertisement, conference attendance, social media, and other similar advertising avenues.

13   (Mayer Decl. ¶¶ 9-10; Mayer Deposition at 35-36 (Dkt. No. 86).) The company enjoys 90-95%

14   renewal rates and has won various awards. (Torgerson Decl. ¶¶ 51-55.)

15   **B.    Defendants' Rebrand**

16   Defendant Cascade is a multinational software company with a network of international

17   subsidiaries, including Parallels. (Declaration of Pam Jacobson ¶ 4 (Dkt. No. 64).) Cascade is the

18   parent company, which has operated under the brand name "Corel" since the 1980s. (Id.; Ratain

19   Decl. Ex. OO (Dkt. No. 83-4 at 59).)  In 2022, Corel rebranded to ALLUDO to explain the

20   relationship between the different brands, and to create a corporate identity. (Ratain Decl. Ex. H

21   at 33-34; id. Ex. I at 40, 51.) Defendants sell a variety of software products, such as Word

22   Perfect, Parallels WinZip, and CorelDRAW. (Ratain Decl. at Ex. H at 34-35; id. Ex. I at 66-67;

23

24

1  id. Ex. OO; Am. Compl. Ex. E (Dkt. No. 7-1).) After the rebrand, they continue to sell these

2  same products under the same names. (See id.)

3        Before rebranding, Defendants learned of Plaintiff's use of ALLUDO. As Defendants

4  concede, "[t]here is no dispute that Cascade was aware of Plaintiff's ALLUDO" mark before

5  adopting it for themselves in 2022. (Defs. MSJ at 24; see also Jacobson Decl. Ex. 19 (RFA No.

6  13 admission).) But Defendants' CEOs testified that she believed that Plaintiff's use of the mark

7  was "completely different; different space, different look, different feel, different audience,

8  different, different." (Deposition of Christa Quarles at 56 (Ratain Decl. Ex. H (Dkt. No. 83-1 at

9  111)).) Defendants also applied to use the mark ALLUDO in 2022, but the USPTO denied the

10  application, noting Plaintiff's pre-existing use of the same mark for "legally identical" goods and

11  the potential for confusion. (Am. Compl. Ex. D; Jacobson Decl. Ex. 19.) Defendants did,

12  however, obtain the www.alludo.com website and continue to use it to market their products.

13  **C.  Evidence of Confusion**

14        Shortly after Defendants rebranded to ALLUDO, Plaintiff began to receive

15  communications that it believes reflect confusion as between the companies and their products.

16  Plaintiff's CEO, Damon Torgerson, started keeping a log of instances he believed showed brand

17  confusion. (See Torgerson Decl. ¶¶ 70-71, 88-93, and Ex. 21.) Though Plaintiff has not

18  identified the number of unique senders, the log has over 5,000 entries. (Id.) Torgerson believes

19  the log shows confusion between the Parties' use of ALLUDO, as expressed by Defendants'

20  employees and consumers, Plaintiffs' users/consumers, and others in the general marketplace.

21  (Torgerson Decl. ¶¶ 70-87.) Plaintiff has not, however, identified any lost customers or sales due

22  to the confusion it has identified. (Torgerson Dep. at 195-96 (Ratain Decl. Ex. A (Dkt. No. 83-

23  1)).) The Court reviews the evidence of confusion in more depth in its Analysis section.

24

To help contextualize the alleged infringement, it is important to consider how each Party uses the ALLUDO mark in the marketplace. Though often imbued with color, Plaintiff's use of the ALLUDO mark generally appears as:



(Declaration of Damon Torgerson Ex. 17 (Dkt. No. 66-1 at 65).) Defendants' use of the ALLUDO mark is typical displayed as:



(Ex. E to Am. Compl. (Dkt. No. 7-1 at 23).)

**D.     Motions for Summary Judgment**

The Parties now seek summary judgment on Plaintiff's claims. Plaintiff seeks summary judgment on its federal trademark infringement, CPA claim, and Defendants' affirmative defense of non-infringement and failure to state a claim. But Plaintiff does not present argument on the unjust enrichment claim. Defendants seek summary judgment "on each of Plaintiff's claims," but they do not address Plaintiff's CPA or unjust enrichment claims. (Defs. Mot. at 1.)

**E.     Experts**

Each party has retained experts whose opinions feature in the Cross-Motions for Summary Judgment. Plaintiff retained Drew Voth to present a variety of damages analyses and calculations. Plaintiff also retained Jason Roos, Ph.D., to offer rebuttal criticism of Defendants' survey experts. Defendants have moved to exclude both Voth's and Roos' opinions.

1       Defendants have retained Joel Steckel, Ph.D. to provide a "brand awareness" survey.

2 Defendants also retained Ran Kivetz, Ph.D. to perform a forward confusion survey, and Sara

3 Parikh, Ph.D. to perform a reverse confusion survey. Lastly, Defendants have retained Jennifer

4 Vanderhart, Ph.D., to provide damages analyses. Plaintiff has moved to exclude all or part of

5 each expert's opinions.

6 **ANALYSIS**

7 **A.    Summary Judgment Standard**

8       Summary judgment is proper "if the movant shows that there is no genuine dispute as to

9 any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

10 56(a). In determining whether an issue of fact exists, the Court must view all evidence in the

11 light most favorable to the nonmoving party and draw all reasonable inferences in that party's

12 favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50 (1986). A genuine issue of

13 material fact exists where there is sufficient evidence for a reasonable factfinder to find for the

14 nonmoving party. Id. at 248. The moving party bears the initial burden of showing that there is

15 no evidence which supports an element essential to the nonmovant's claim. Celotex Corp. v.

16 Catrett, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the nonmoving party

17 then must show that there is a genuine issue for trial. Anderson, 477 U.S. at 250. If the

18 nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving

19 party is entitled to judgment as a matter of law." Celotex, 477 U.S. at 323-24. In addition,

20 "'[b]ecause of the intensely factual nature of trademark disputes, summary judgment is generally

21 disfavored in the trademark arena.'" Rearden LLC v. Rearden Com., Inc., 683 F.3d 1190, 1202

22 (9th Cir. 2012) (quoting Interstellar Starship Servs., Ltd. v. Epix Inc., 184 F.3d 1107, 1109 (9th

23 Cir. 1999)).

24

**B.    Federal Trademark Infringement**

After reviewing the claim elements, the Court analyzes the "likelihood of confusion" element—the sole disputed issue as to Plaintiff's trademark claims.

**1.    Basic Framework of the Claims**

"The Lanham Act prohibits conduct that would confuse consumers as to the origin, sponsorship, or approval of goods or services." OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc., 897 F.3d 1008, 1013 (9th Cir. 2018). "To prevail on a claim of trademark infringement under the Lanham Act, 15 U.S.C. § 1114, a party 'must prove: (1) that it has a protectible ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion.'" Network Automation, Inc. v. Advanced Sys. Concepts, Inc., 638 F.3d 1137, 1144 (9th Cir. 2011) (quoting Dep't of Parks & Recreation for the State of Cal. v. Bazaar Del Mundo Inc., 448 F.3d 1118, 1124 (9th Cir. 2006)). "A likelihood of confusion exists not only when a consumer viewing a service mark is likely to purchase the identified services under the mistaken belief that they are the services of another service-provider, but also when the consumer would be likely to assume that the identified services are in some way associated with another service-provider." Rodeo Collection, Ltd. v. W. Seventh, 812 F.2d 1215, 1217 (9th Cir. 1987).

Because the Parties agree that Plaintiff has a protectible ownership interest in the ALLUDO trademark, the Court focuses on the second element—likelihood of confusion. (See Defs. MSJ (omitting challenge to the first element); Pl. Opp. to Defs. MSJ at 14 (noting Defendants' concession); Defs. Reply to MSJ (omitting any response or challenge).)

As to the likelihood of confusion, "we ask 'whether a "reasonably prudent consumer" in the marketplace is likely to be confused as to the origin of the good or service bearing one of the

1    marks.'" Punchbowl, Inc. v. AJ Press, LLC, 90 F.4th 1022, 1027 (9th Cir. 2024) (quoting

2    Dreamwerks Prod. Grp. v. SKG Studio, 142 F.3d 1127, 1129 (9th Cir. 1998)). That analysis

3    requires consideration of the eight "Sleekcraft" factors: "(1) strength of the mark; (2) proximity

4    of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing

5    channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser;

6    (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines."

7    AMF Inc. v. Sleekcraft Boats, 599 F.2d 341 (9th Cir. 1979), abrogated on other grounds by

8    Mattel, Inc. v. Walking Mountain Prods., 353 F.3d 792, 810 n.19 (9th Cir. 2003). "The

9    Sleekcraft factors are intended as an adaptable proxy for consumer confusion, not a rote

10   checklist." Network Automation, 638 F.3d at 1145. The factors "must be applied in a flexible

11   fashion" because "we do not count beans." Rearden, 683 F.3d at 1209 (citation and quotation

12   omitted).

13        The Court reviews the Sleekcraft factors in the subsections that follow.

14        **2.    Strength of Mark**

15        "Courts measure a mark's strength both conceptually—by its inherent distinctiveness—

16   and commercially—by its actual marketplace recognition." Lerner & Rowe PC v. Brown

17   Engstrand & Shely LLC, 119 F.4th 711, 719 (9th Cir. 2024) (quotation omitted). "Even when a

18   mark is not inherently distinctive, commercial strength—'extensive advertising, length of

19   exclusive use, public recognition'—can compensate for its conceptual weakness." Id. (quoting

20   Am. Int'l Grp., Inc. v. Am. Int'l Bank, 926 F.2d 829, 832 (9th Cir. 1991)). "Marks are often

21   classified in one of five categories of increasing distinctiveness: (1) generic, (2) descriptive, (3)

22   suggestive, (4) arbitrary, or (5) fanciful." Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery,

23   150 F.3d 1042, 1047 (9th Cir. 1998). Suggestive, arbitrary, and fanciful marks "meet the

24

1  distinctiveness element automatically," while generic marks never qualify as distinctive. Id.

2  "Descriptive marks are not inherently distinctive and hence do not initially satisfy the

3  distinctiveness element . . . [b]ut . . . can acquire distinctiveness if the public comes to associate

4  the mark with a specific source." Id.

5        The Court finds Plaintiff's mark to be arbitrary and therefore distinctive. The term

6  ALLUDO is not generic and has no suggestive or descriptive value. That is because the "mark

7  neither describes nor 'conveys an impression of a good.'" One Indus., LLC v. Jim O'Neal

8  Distrib., Inc., 578 F.3d 1154, 1164 (9th Cir. 2009) (holding that a "rounded O" mark had no

9  intrinsic or inherent connection to the motocross helmet at issue). The word ALLUDO is made-

10  up and does not describe or suggest Plaintiff's educational software platform. The Court finds

11  the mark to be arbitrary and therefore distinctive.

12        Defendants insist that Alludo is suggestive because "the term is Latin for 'play,' a fact

13  that Plaintiff advertises to consumers." (Def. Opp. Pl. MSJ at 14.) This argument is

14  unconvincing. True, Plaintiff's website has a page explaining the connection between ALLUDO

15  and "ludo"—the Latin word for play. But, as the Ninth Circuit has explained, a mark is

16  suggestive when "it requires a mental leap from the mark to the product." Brookfield Commc'ns,

17  Inc. v. W. Coast Ent. Corp., 174 F.3d 1036, 1058 (9th Cir. 1999) (considering the trademark

18  "MovieBuff" and finding it suggestive). Here, with a working knowledge of Latin, a mental leap

19  could get you from ALLUDO to the concept of "play." But making the leap from "play" to

20  Plaintiff's actual product requires a blind guess. This does not track the law, and the Court rejects

21  Defendants' argument.

22        The Court also finds that the mark has commercial strength, though this factor is less

23  important given the mark's distinctiveness. "A mark's overall strength is relative and cannot be

24

1    determined by mechanistically assessing its conceptual or commercial strengths." <u>M2 Software,</u>

2    <u>Inc. v. Madacy Entm't</u>, 421 F.3d 1073, 1081 (9th Cir. 2005). Commercial success can help

3    bolster an otherwise "conceptually weak" mark, but, similarly, "lack of commercial strength

4    cannot diminish the overall strength of a conceptually strong mark so as to render it undeserving

5    of protection." <u>Id.</u> Here, Plaintiff's ALLUDO platform has been used by over 5,000 schools with

6    over 142,000 users and it has spent "hundreds of thousands of dollars in marketing and

7    advertising since August 2017 to present." (Declaration of Christopher Mayer ¶ 9 (Dkt. No. 67).)

8    While Alludo is hardly a household name, it has enjoyed some commercial success within the

9    education market since 2017. This further supports the Court's determination that the mark is

10   strong.

11        Defendants fail to convince the Court that the mark is weak because their brand-

12   recognition expert found little evidence of its notoriety. Defendants put great stock in a study

13   conducted by their expert, Joel Steckel, Ph.D., who found that only 3 of the 250 people in his

14   cohort of educators and administrators currently employed by a K-12 school or school district

15   recognized Plaintiff's ALLUDO product. (Expert Report of Joel Steckel, Ph.D. ¶¶ 15-17, 44

16   (Dkt. No. 73-1).) But Steckel's survey results does not convince the Court that the mark's

17   possibly limited commercial strength diminishes or undermines its distinctive strength. Steckel's

18   survey may be relevant to the trier of fact, but it is not persuasive on this <u>Sleekcraft</u> factor.

19   Relatedly, the Court rejects Plaintiff's Motion to Exclude Steckel's opinion. Plaintiff argues that

20   Steckel did not properly capture individuals who may be part of Plaintiff's target market,

21   rendering his survey unreliable. While the Court understands Plaintiff's arguments, they go to

22   the weight of Steckel's report and opinions, not their admissibility. The Court therefore DENIES

23   the Motion to Exclude Steckel.

24

1    Weighing the elements of this <u>Sleekcraft</u> factor, the Court finds this factor weighs in

2    Plaintiff's favor.

3    **3.        Proximity of the Goods**

4    Related goods are those "'which would be reasonably thought by the buying public to

5    come from the same source if sold under the same mark.'" <u>Sleekcraft</u>, 599 F.2d at 348 n.10

6    (citations omitted). "Goods or services that are closely related are generally more likely than

7    unrelated goods or services to confuse the public as to their sources." <u>La Quinta Worldwide LLC</u>

8    <u>v. Q.R.T.M., S.A. de C.V.</u>, 762 F.3d 867, 875 (9th Cir. 2014). "The proximity of goods is

9    measured by whether the products are: (1) complementary; (2) sold to the same class of

10   purchasers; and (3) similar in use and function." <u>Network Automation</u>, 638 F.3d at 1150. But

11   "the mere existence of some similarity does not necessarily render the businesses so closely

12   related as to suggest strongly a likelihood of confusion." <u>Rearden</u>, 683 F.3d at 1212 (citation and

13   quotation omitted). The Ninth Circuit urges a "rather flexible approach to the whole notion of

14   competition." <u>Id.</u> For example, the Ninth Circuit found two entities "are not properly

15   characterized as non-competitors" where "both companies offer products and services relating to

16   the entertainment industry generally, and their principal lines of business both relate to movies

17   specifically and are not as different as guns and toys or computer circuit boards and the Rocky

18   Horror Picture Show." <u>Brookfield</u>, 174 F.3d at 1056 (citations omitted).

19   There is little evidence that the software products at issue are complementary, sold to the

20   same class of purchases, or similar in use and function. The Court reviews Plaintiff's three main

21   arguments. First, Plaintiff relies heavily on the fact that the USPTO found Defendants' and

22   Plaintiff's goods and services to be "legally identical." (<u>See</u> Pl. Opp. to Defs. MSJ at 28.) While

23   this certainly weighs in favor of a finding of relatedness, the fact is not dispositive. As

24

1    Defendants point out, the USPTO's analysis is based solely on the description in the trademark

2    application, not on the actual products. See B&B Hardware, Inc. v. Hargis Indus., Inc., 575 U.S.

3    138, 156 (2015) (noting the limited scope of the USPTO's analysis). And the USPTO itself noted

4    that Plaintiff's software had a "more narrow" reach than Defendants' software, and that

5    Defendants could resubmit an amended application (which they have not). (See Jacobson Decl.

6    Ex. 19 at 3 (Dkt. No. 64-1 at 166).) The Court is not convinced that the USPTO's finding is

7    persuasive on this Sleekcraft factor. Second, Plaintiff argues that the parties direct their software

8    to overlapping industries, noting that nearly all of Plaintiff's target customers fall within

9    Defendants' customer base. This appears true, but, on the flip side, Defendants' sales and

10   marketing to school districts accounts for roughly 1% of sales to new customers after the rebrand

11   to "Alludo." (See Vanderhart Report, Ex. D. (Dkt. No. 91).) While Plaintiff is clearly targeting

12   clients who might also be interested in Defendants' products, Defendants' target audience is far

13   broader than Plaintiff's. This tends to favor Plaintiff, though it is but one of the factors. Lastly,

14   Plaintiff argues that the software is complementary because Plaintiff's ALLUDO platform

15   provides training to users on the kinds of software Defendants sell. (Pl. Opp. at 28-29 (citing

16   Mayer Decl. ¶ 20 and Ex. 9).) But the Court finds no evidence that anyone uses the products

17   together or that Plaintiff actually provides training on how to use Defendants' software,

18   notwithstanding Plaintiff's counsel's representation during oral argument that Plaintiff provides

19   training on Defendants' software. (See Hearing Tr. at 46.)

20        The Court here finds that this factor favors Defendants. While there is evidence of

21   overlapping markets, there is less evidence that the products are complementary or similar in use

22   and function.

23

24

### 4. Similarity of the Marks

The Court finds that the marks here are quite similar, a factor that favors Plaintiff.

As Plaintiff argues: "[i]n evaluating the similarity of the marks, 'first, the marks must be considered in their entirety and as they appear in the marketplace; second, similarity is adjudged in terms of appearance, sound, and meaning; and third, similarities are weighed more heavily than differences.'" (Pl. MSJ at 22 (quoting GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1206 (9th Cir. 2000)).) Here, these factors all supporting a finding of similarity. First, the visual depiction of ALLUDO in the marketplace is quite similar. The primary point of distinction is Plaintiff's use of a lemur on top of ALLUDO, while Defendants' place a whale-headed-shaped object to the left of the mark.

 

(Declaration of Damon Torgerson Ex. 17 (Dkt. No. 66-1 at 65). (Ex. E to Am. Compl. (Dkt. No. 7-1 at 23).) Although the Court notes the visual distinctions, their similarities are visually striking, particularly in the use of a similar font and the identical word. Second, each Party purports pronounce the word ALLUDO the same way: "ah-LOO-dough." (Am. Compl. Ex. E (Dkt. No. 7-1 at 23); Torgerson Decl. ¶ 26).) On balance, the Court finds that this factor favors a finding of similarity in the marks even construing the points of distinction in Defendants' favor.

### 5. Evidence of Actual Confusion

The Court finds that the evidence of actual confusion favors Plaintiff. After reviewing the legal test, the Court considers Plaintiff's and Defendants' evidence of confusion, and assesses its relative strength.

1

a.    **Legal test**

2      "'The test for likelihood of confusion is whether a 'reasonably prudent consumer' in the

3   marketplace is likely to be confused as to the origin of the good or service bearing one of the

4   marks.'" <u>Entrepreneur Media, Inc. v. Smith</u>, 279 F.3d 1135, 1140 (9th Cir. 2002) (quoting

5   <u>Dreamwerks</u>, 142 F.3d at 1129). "[C]onsumer confusion" constitutes "the sine qua non of

6   trademark infringement." <u>Id.</u> at 1142. "It is well established that the particular field or market in

7   which trademark protection is being sought must be taken into account." <u>Rearden</u>, 683 F.3d at

8   1213. Consumer confusion can still be found even if there is no purchase—the use of another's

9   trademark in a manner calculated "to capture initial consumer attention, even though no actual

10  sale is finally completed as a result of the confusion, may be still an infringement." <u>Dr. Seuss</u>

11  <u>Enterprises, L.P. v. Penguin Books U.S.A., Inc.</u>, 109 F.3d 1394, 1404 (9th Cir. 1997); <u>see</u> M2,

12  421 F.3d at 1083 (considering evidence of actual confusion without requiring a nexus to specific

13  purchases).

14      While "litigants usually satisfy the 'likelihood of confusion' test by providing direct

15  evidence of consumer confusion," non-consumer confusion can be considered. <u>Rearden</u>, 683

16  F.3d at 1214. Non-consumer confusion "may also be relevant to the 'likelihood of confusion'

17  inquiry in three specific and overlapping circumstances—namely where there is confusion on the

18  part of: (1) potential consumers; (2) non-consumers whose confusion could create an inference

19  that consumers are likely to be confused; and (3) non-consumers whose confusion could

20  influence consumers." <u>Id.</u>  That is because "[i]n all three instances, the non-consumer confusion

21  bears a relationship to the existence of confusion on the part of consumers themselves." <u>Id.</u> But

22  "the degree to which non-consumer confusion can serve as a proxy for consumer confusion

23  depends on how the groups are situated in relation to one another." <u>Id.</u> at 1216.

24

1

                    b.      **Plaintiff's evidence of confusion**

2          Plaintiff has provided a variety of evidence of actual confusion.

3          First, Plaintiff identifies actual confusion from its consumers. Plaintiff offers a

4   declaration from Sara Domonoske, the Director of Curriculum and Instruction at a California

5   school district, who alerted Plaintiff in the Fall of 2022 about confusion accessing Plaintiff's web

6   platform. (See Declaration of Sara Domonoske ¶¶ 7-9, 12-14 Ex. A (Dkt. No. 69-1).) According

7   to Domonoske, when she first began to use ALLUDO in Spring 2021, she would access it by

8   searching the internet for "alludo." (Id. ¶¶ 6, 10-11.) But in the Fall of 2022, she learned that

9   coordinators and managers could no longer find the ALLUDO platform by performing an

10  internet search for "alludo." (Id. ¶ 11.) Indeed, she found that Defendants' "alludo.com" was the

11  top internet search result for "alludo." (Id. ¶ 11.) She sent an email to Plaintiff in December 2022

12  to notify them about the confusion that staff at her district had encountered in locating Plaintiff's

13  website. (Id. Ex. A.) Plaintiff also offers a declaration from Rae Fearing, who worked at a

14  California school district and used Plaintiff's platform from 2020 through September 2023.

15  (Declaration of Rae Fearing ¶¶ 4, 8-10 (Dkt. No. 68).) Fearing directed users to access Plaintiff's

16  website by using a Google search for "alludo," but starting in the Fall of 2022, she and other

17  users were directed to Defendants' website when doing that same search. (Id. ¶¶ 11-12.) Fearing

18  notified Plaintiff about this confusion in January 2023. (Id. ¶¶ 12-13.)

19         Defendants object to Fearing and Domonoske's declarations because they were disclosed

20  late in discovery. The Court does not find this a valid basis on which to strike the declarations.

21  While the witnesses were identified late in the discovery period, they were nevertheless timely

22  disclosed and Defendants could have sought to depose them. Defendants did not do so and they

23  have not identified any evidence of prejudice stemming from the timing of the disclosure. As to

24  Domonoske only, Defendants also object to what they believe is hearsay in her declaration.

(Defs. Opp. to Pl. MSJ at 6-7.) The Court is unpersuaded. Domonoske testifies about her own

confusion in accessing Plaintiff's website in the Fall 2022, including her own internet search for

the name "alludo" and the corresponding results. There is no hearsay in her statement of personal

experience. She is also a Director to whom others expressed their confusion about accessing

Plaintiff's website, and that testimony is admissible under Rule 803(3) as a present sense

impression. See Lahoti v. Vericheck, Inc., 636 F.3d 501, 509 (9th Cir. 2011) (determining that

testimony describing calls from customers about their confusion was admissible hearsay "under

the 'state of mind' exception to the hearsay rule").

      Second, Plaintiff points to confusion among potential consumers about source confusion.

For example, Plaintiff provides an email exchange with a school superintendent and an

unidentified individual discussing the superintendent's potential interest in using Plaintiff's

platform and his mistaken belief that Plaintiff was owned by Defendants. (Torgerson Decl. Ex.

22.) The superintendent wrote: "As you probably know, we are not LCAP winners so additional

dollars are tight and we don't venture far from home on many of our services." (Id.) Plaintiff

believes this statement evidences a preference for a local or regional brand, instead of

Defendants' international brand. (See Torgerson Decl. ¶ 73.) But Plaintiff has not provided a

declaration from the superintendent to explain what he meant. Torgerson also notes that another

public school board confused the two brands when discussing renewing their contract with

Plaintiff. (See Torgerson Decl. ¶ 74.)

      Third, Plaintiff provides evidence of confusion from Defendants' employees and

customers. Torgerson notes that after the rebrand, several of Defendants' employees tried to link

their profiles to Plaintiff's social media profiles on LinkedIn. (Torgerson Decl. ¶ 76.) And

Torgerson reports that Plaintiff has received many communications from Defendants' customers

1    who have contacted Plaintiff seeking assistance with Defendants' products and are unhappy

2    about the quality of customer service. (Id. ¶¶ 77-80, 86-87.) Lastly, Torgerson points out that

3    Plaintiff continues to receive emails from members of the public seeking to do business with

4    Defendants, who seek employment with Defendants, and the media posts that confuse the

5    entities. (Id. ¶¶ 81-82, 84-87.) Additionally, Plaintiff has received confidential board

6    communications intended for Defendants' CEO, and even an email from a public school district

7    that was negotiating a purchase from Defendants sending over contract redlines. (See id. ¶ 83;

8    Jacobson Decl. Exs. 1 & 4.)

9        Fourth, Torgerson has prepared and maintained a log tracking instances of confusion as

10   to Plaintiff's and Defendants' use of the ALLUDO mark. (See Torgerson Decl. ¶¶ 70-71, 88-93.)

11   Torgerson states that he has "spent hundreds of hours of my time dealing with, and cataloging,

12   thousands of instances of confusion where our ALLUDO brand has been mistakenly associated

13   with Defendants." (Id. ¶ 70.) He claims that he has "prepared an Excel spreadsheet to record

14   each instance of confusion as it was received in the ordinary course of business at or close to the

15   date upon which it was received." (Id. ¶ 89.) He claims that he began this process shortly after

16   receiving numerous misdirected emails after Defendants' rebrand. (Id. ¶¶ 71, 88.) He states that

17   he has cataloged more than 5,000 instances of what he believes is confusion. (See id. ¶ 70 & Ex.

18   21.)

19       Defendants ask the Court to exclude Torgerson's log, arguing that it contains

20   inadmissible hearsay that cannot qualify for any exception. Before diving into Defendants'

21   argument, the Court first notes that the at summary judgment "we do not focus on the

22   admissibility of the evidence's form" but rather "the admissibility of its contents." Fraser v.

23   Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003). "To survive summary judgment, a party does not

24

1   necessarily have to produce evidence in a form that would be admissible at trial, as long as the

2   party satisfies the requirements of Federal Rules of Civil Procedure 56." Block v. City of Los

3   Angeles, 253 F.3d 410, 418–19 (9th Cir. 2001).

4         The Court finds that the log is admissible as an exception to hearsay under Rule 803(6).

5   Under Rule 803(6), a document may be admitted as a business record if it is shown to be "(1)

6   made by a regularly conducted business activity, (2) kept in the 'regular course' of that business,

7   (3) 'the regular practice of that business to make the memorandum,' (4) and made by a person

8   with knowledge or from information transmitted by a person with knowledge." Paddack v. Dave

9   Christensen, Inc., 745 F.2d 1254, 1258 (9th Cir. 1984). Here, Torgerson's declaration states that

10  he created the log shortly after learning of confusion arising out of Defendants' use of the

11  ALLUDO mark, that he kept the log as part of his regular duties as CEO, and that he has

12  personal knowledge of all of its contents. (Torgerson Decl. ¶¶ 70-71, 88-93.) The Court remains

13  unpersuaded by Defendants' argument that Torgerson only made the log in anticipation of

14  litigation and that this renders the log untrustworthy as part of an irregular activity. (Defs. Opp.

15  to Pl. MSJ at 4 (citing Torgerson Decl. ¶¶ 88-89).) There is no evidentiary support for

16  Defendants' argument. The two paragraphs in Torgerson's declaration that Defendants cite states

17  that he started his log after receiving misdirected emails and that he "prepared an Excel

18  spreadsheet to record each instance of confusion as it was received in the ordinary course of

19  business at or close to the date upon which it was received." (Torgerson Decl. ¶¶ 88-89.) The

20  fact that Torgerson only started the log after Defendants began to use ALLUDO does not mean it

21  was an irregular activity or prepared for litigation. Rather, it reflects the fact that Plaintiff had no

22  need to log confusion before Defendants started to use the very same mark. The Court overrules

23  the objection and finds the log admissible as a business record.

24

The Court does not reach the issue of whether the log could qualify as a chart or summary under Rule 1006, as doing so is unnecessary at this juncture. The Court also notes that Defendants take issue with the way in which Torgerson has made his entries in the log. Defendants argue the log contains "inaccuracies" because many of the contacts were "misdirected blast emails," "misdirected communications from job applicants, careless or inattentive communications from customers, and incorrect social media tagging, none of which is evidence of actual confusion." (Defs. Opp. to Pl. MSJ at 6-7.) Defendants are free to attack the log at trial, but this characterization does not demonstrate a basis to exclude it.

### c.    Defendants' evidence about a lack of confusion

Aside from attacking Plaintiff's evidence of confusion, Defendants rely on their confusion experts who have found little to no evidence of either forward or reverse confusion.

Forward confusion occurs when consumers believe the junior mark's goods come from the senior mark holder—in this case that Defendants' products come from Plaintiff. See Ironhawk Techs., Inc. v. Dropbox, Inc., 2 F.4th 1150, 1159-60 (9th Cir. 2021). "[R]everse confusion occurs when a person who knows only of the well-known junior user comes into contact with the lesser-known senior user, and because of the similarity of the marks, mistakenly thinks that the senior user is the same as or is affiliated with the junior user." Id. at 1160.

Dr. Ran Kivetz prepared a survey to test forward confusion, using an "Eveready" survey format. He found a confusion rate between .5% and 3.0% which falls within a range Defendants believe shows little confusion. (Defs. MSJ at 19 (citing Kivetz Report ¶ 25 (Ex. R to the Declaration of Bruce Ratain ISO Defs. MSJ (Dkt. No. 83-2).) Plaintiff has moved to exclude Kivetz's report on the theory that his survey failed to "approximate realistic market conditions" and wrongly assumed that prospective purchasers of Defendants' products would not encounter both Plaintiff's and Defendants' websites through an internet search. According to Plaintiff, this

1    meant that Kivetz should not have conducted an "<u>Eveready</u>" survey because a different type of

2    survey should be used when customers are exposed to both marks at the same time. (<u>See</u> Pl. Mot.

3    at 6-7; Kivetz Report at ¶¶ 29-30.) Plaintiff presents a reasonable criticism, but it goes to the

4    weight of the opinion, not its admissibility. Kivetz believes that the type of survey he used was

5    appropriate for the circumstances presented and Plaintiff will be able to question him about this

6    at trial. The criticism does not warrant exclusion. The Court thus DENIES the Motion to Exclude

7    Kivetz's opinion.

8        Dr. Sara Parikh performed a reverse confusion survey which found only 1% of those

9    surveyed showed confusion. (Report of Sarah Parikh, Ph.D. at ¶ 9 (Ex. S to the Declaration of

10   Bruce Ratain ISO Defs. MSJ (Dkt. No. 83-3)).) Parikh surveyed 303 U.S. school administrators

11   who were involved in some way with professional development. She found that just 1% of the

12   people who saw Plaintiff's webpage believed Defendants software products were related to

13   Plaintiff's product. (<u>Id.</u> ¶ 9.) As with Kivetz, Plaintiff attacks Parikh's decision to use an

14   <u>Eveready</u> survey and it asks the Court to exclude it. But as explained above, the criticism of this

15   type of survey does not warrant its exclusion. Plaintiff can attack the survey choice, which goes

16   to the weight of the evidence, not its admissibility. Plaintiff also argues that Parikh used

17   improper screening questions that skewed the survey results. This criticism goes to the weight,

18   not the admissibility of Parikh's opinion. The Court therefore DENIES the Motion as to Parikh's

19   opinions.

20        **d.    Conclusion**

21        The Court finds that there is evidence here of actual and potential confusion. Plaintiff has

22   identified current users, potential customers, and non-customers alike who have identified

23   confusion as to the affiliation between both Parties and their use of the same mark. Just how

24   great and significant the confusion is difficult to assess on a limited record, where much of the

1    confusion is tracked in a log that is not explained in great depth. And Defendants' confusion

2    experts present some evidence that the confusion identified may not be particularly stout. While

3    the Court puts little weight on these expert's findings, it takes note of them in weighing this

4    Sleekcraft factor. As the Ninth Circuit has explained, "a showing of actual confusion among

5    significant numbers of consumers provides strong support for the likelihood of confusion."

6    Network Automation, 638 F.3d at 1151 (quotation omitted). Here, the record shows a good deal

7    of confusion among consumers and non-consumers alike, but the Court cannot conclude that

8    they constitute "significant numbers." That kind of determination is more accurately made on a

9    full record, including weighing testimony in open court by a jury who is not bound by the

10   summary judgment standard. Nevertheless, the Court finds that this factor favors Plaintiff.

11        **6.    Marketing Channels Used**

12        "In assessing marketing channel convergence, courts consider whether the parties'

13   customer bases overlap and how the parties advertise and market their products." Pom

14   Wonderful LLC v. Hubbard, 775 F.3d 1118, 1130 (9th Cir. 2014) (citation omitted). "Marketing

15   channels can converge even when different submarkets are involved so long as 'the general class

16   of . . . purchasers exposed to the products overlap.'" Id. (quoting Sleekcraft, 599 F.2d at 353).

17   For example, in Sleekcraft, the Ninth Circuit found convergence where both companies sold

18   boats to authorized retail dealers in different localities, used the same sales methods, advertised

19   extensively through different national magazines, and priced their products almost identically.

20        Plaintiff provides some evidence that the Parties' marketing channels overlaps. Plaintiff

21   uses word of mouth, conferences and events, and online marketing through web search, social

22   media, email subscriptions. (Mayer Dep. at 35-36 (Dkt. No. 86).) Defendants use those same

23   marketing tools, and both entities market to school districts. (See Jacobson Decl. Ex. 16 (RFA

24

1    responses admitting to marketing to some overlapping customers); Deposition of Michelle

2    Chiantera at 107 (Ratain Decl. Ex. I (Dkt. No. 83-1 at 130)).) And while Defendants may market

3    more broadly to non-educators, this does not show a lack of convergence. There remains a

4    general class of purchasers who may receive marketing from both entities. On the record before

5    the Court, the Court finds this factor favors Plaintiff.

6        **7.    Type of Goods and the Purchaser Degree of Care**

7        Because likelihood of confusion is measured with reference to a "reasonably prudent

8    consumer," the Court must consider the degree of care the consumer will use when buying the

9    good. See Brookfield, 174 F.3d at 1060. "What is expected of this reasonably prudent consumer

10   depends on the circumstances." Id. Where goods are inexpensive, purchasers "are likely to

11   exercise less care, thus making confusion more likely." Id. But when goods are expensive, we

12   expect less confusion given the greater degree of care that will be used by the purchaser. Id.

13       Given the degree of care used by consumers of both Parties' goods, this factor favors

14   Defendants. Neither Plaintiff nor Defendants offer cheap goods. Plaintiff sells its product for a

15   few hundred to several thousands of dollars. (Ratain Decl. Ex. W (Dkt. No. 85.) As Plaintiff

16   admits, purchasers of its platform "may be sophisticated," a point highlighted by the fact that the

17   ALLUDO platform is expensive and often purchased by public school districts through some

18   deliberative process. (Pl. Opp. at 29.) Defendants' products cost between $100 to $550. (See

19   Ratain Decl. Ex. X (Dkt. No. 83-3).) Here, consumers of both products would appear to engage

20   in deliberations before spending significant sums on either product. The Court is not faced here,

21   for example, with "consumers [who] are likely to exercise a low degree of care when purchasing

22   either company's inexpensive . . . beverages." Pom, 775 F.3d at 1127. This factors favors

23

24

1  Defendants, as it tends to show that few consumers would actually purchase Defendants'

2  software instead of Plaintiffs.

3        Plaintiff presents two contrary arguments that have some merit, but which do not

4  convince the Court. First, Plaintiff argues that no matter how sophisticated the consumer may be,

5  consumers here can be confused given the identical nature of the marks. Plaintiff cites to a

6  district court decision, where the court found it "irrational to expect that even the most

7  sophisticated consumer will exercise the kind of scrupulous examination that would enable him

8  or her to discern the difference between" two identical marks for highly specialized services.

9  Electropix v. Liberty Livewire Corp., 178 F. Supp. 2d 1125, 1133 (C.D. Cal. 2001). There is

10 some allure to this argument, but the Court believes the jury will be best placed to resolve this

11 question. On cross-motions for summary judgment, the Court cannot reach that same conclusion.

12 Second, Plaintiff notes that even if those purchasing its software are sophisticated, the end users

13 are not, and they may be prone to and sow confusion. This is a reasonable point, but it does not

14 convince the Court to find in Plaintiff's favor. On balance, the overall sophistication of the

15 purchasers favors Defendants on this factor, though the Court puts less weight on this given the

16 fact that Defendants use the very same mark. See Electropix, 178 F. Supp. 2d at 1133; see also

17 Brookfield, 174 F.3d at 1060 (recognizing "that confusion may often be likely even in the case of

18 expensive goods sold to discerning customers").

19    **8.    Defendants' Intent in Selecting the Mark**

20        "It is settled that '[a] party claiming trademark infringement need not demonstrate that

21 the alleged infringer intended to deceive consumers.'" M2, 421 F.3d at 1085 (quoting E. & J.

22 Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1293 (9th Cir. 1992)). "When the alleged

23

24

1    infringer knowingly adopts a mark similar to another's, we must presume that the public will be

2    deceived." Id. (citing Sleekcraft, 599 F.2d at 354).

3         "There is no dispute that Cascade [Defendant] was aware of Plaintiff's ALLUDO" mark

4    before adopting it for themselves in 2022. (Defs. MSJ at 24.) Indeed, Defendants knew of the

5    existing mark and had its own trademark application denied because of its existence. Thus, the

6    sole question is whether Defendants have overcome this presumption. Defendants note that

7    where a defendant knows of the existing mark, but believes it can carve-out a non-infringing use,

8    it may overcome the presumption of willful infringement. See M2, 421 F.3d at 1085. Here,

9    Defendants rely on their CEOs' testimony that she believed that Plaintiff's use of the mark was

10    "completely different; different space, different look, different feel, different audience, different,

11    different." (Deposition of Christa Quarles at 56 (Ratain Decl. Ex. H (Dkt. No. 83-1 at 111)).)

12    This evidence tends to favor Defendants. And Plaintiff has otherwise not identified other

13    evidence of an intent to trade on Plaintiff's senior mark. Based on the record presented, the Court

14    finds an absence of evidence that Defendants intended to use Plaintiff's mark to trade on its

15    existence or to diminish its value. This factor favors Defendants, though Plaintiff will be free to

16    explore this issue further at trial and the jury may well reject Quarles' testimony.

17         **9.    Likelihood of Expansion of the Product Lines**

18         Neither party argues that this factor is relevant or anything other than neutral. The Court

19    does not consider this factor.

20         **10.    Conclusion**

21         Neither party here was demonstrated a clear entitlement to summary judgment on

22    Plaintiff's trademark claims. Plaintiff has shown evidence of actual confusion, a strong mark,

23    and similarity in marketing channels. While the evidence of confusion exists in a variety of

24

1    forms, its strength cannot be fully assessed and credited to Plaintiff on cross-motions for

2    summary judgment. The Court is not faced with a clear record sufficient to find that the actual

3    confusion here is "significant." See Network Automation, 638 F.3d at 1151. Defendants have

4    also shown evidence that the confusion may be limited given the fact that purchasers here will

5    exercise more care, there is a limited overlap in consumer markets, and the fact that the goods do

6    not appear to be particularly similar. And Defendants have provided other expert opinions that

7    may convince a jury of the lack of actionable confusion. On balance, the Sleekcraft factors do

8    not clearly favor either Party, particularly where the Court must construe the facts against each

9    non-moving party. A jury will need to assess the record, weigh the evidence, and interrogate this

10    issue further. The Court therefore DENIES both Motions for Summary Judgment, finding a

11    dispute of fact as to the likelihood of confusion.

12        The Court notes that its assessment of the Sleekcraft factors do not constitute any

13    findings of fact and the jury will need to consider the record with fresh eyes and ears.

14    **C.    CPA Claim**

15        Because there remain disputes of fact concerning the trademark claims, Plaintiff's CPA

16    claim must also proceed to trial. As Plaintiff notes, the analysis of the CPA claim "will follow

17    that of the [federal] trademark infringement and unfair competition claims; it will turn on the

18    likelihood of confusion regarding a protectable mark." (Pl. MSJ at 29 (quoting Safeway, LLC v.

19    Teupen Am., LLC, 717 F. Supp. 2d 1181, 1192 (W.D. Wash. 2010)).) Accordingly, the Court

20    DENIES summary judgment as to the CPA claim.

21

22

23

24

1    **D.    Remaining Motions to Exclude**

2        Having already denied the Motions to Exclude Steckel, Parikh, and Kivetz, the Court

3    analyzes the three additional motions to exclude: (1) Defendants' Motion to Exclude Voth; (2)

4    Plaintiff's Motion to Exclude Vanderhart; and (3) Defendants' Motion to Exclude Roos.

5        **1.    Voth**

6        Plaintiff retained Drew Voth to provide opinions about damages. Defendants move to

7    exclude Voth's opinion as to actual damages, actual confusion, corrective advertising, and

8    trademark/goodwill valuation. The Court reviews each issue.

9        **a.    Actual damages**

10       Under the Lanham Act, the prevailing party may "recover (1) defendant's profits, (2) any

11   damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). "The

12   court shall assess such profits and damages or cause the same to be assessed under its direction."

13   Id. And "[i]n assessing profits the plaintiff shall be required to prove defendant's sales only;

14   defendant must prove all elements of cost or deduction claimed." Id. "In awarding damages

15   under § 1117(a)(2) [actual damages to plaintiff] . . . '[t]he trier of fact must distinguish between

16   proof of the fact of damages and the amount of damages because a mark holder is held to a lower

17   standard in proving the exact amount of actual damages.'" Jason Scott Collection, Inc. v.

18   Trendily Furniture, LLC, 68 F.4th 1203, 1220 (9th Cir. 2023), cert. denied, 144 S. Ct. 550, 217

19   L. Ed. 2d 293 (2024) (quoting Skydive Arizona, Inc. v. Quattrocchi, 673 F.3d 1105, 1112 (9th

20   Cir. 2012)).

21       Defendants attack Voth's conclusion about actual damages on the theory that he makes

22   unsupported factual inferences about whether a decline in sales is attributable to Defendants' use

23   of the mark. The Court sees merit in Defendants' criticism. But it identifies a potential flaw in

24   the analysis, not in a methodology that might render his opinion subject to exclusion. Defendants

1    will be free to attack Voth on this point, but the Court declines to exclude his opinion. The Court

2    DENIES the Motion as to this issue.

3          **b.**    **Actual confusion**

4          Defendants ask to strike paragraphs 18-28 of Voth's report, arguing that he is improperly

5    opining on the question of whether there is actual confusion—a jury question. This portion of the

6    report primarily summarizes the facts that Voth reviewed to prepare his opinions. He is not being

7    presented as an expert on whether there is or is not actual confusion. And the Court does not read

8    his report to make any such statement. The Court thus DENIES the Motion to strike these

9    statements.

10        <u>Corrective Advertising</u>

11         Defendants attack Voth's determination that corrective advertising damages should be

12   calculated as 25% of Defendants' advertising spend, arguing that he is misapplying Tenth Circuit

13   law in <u>Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.</u>, 561 F.2d 1365, 1375-76 (10th

14   Cir. 1977) and that he has not arrived at any independent determination on this issue. The Court

15   agrees with Defendants. It is up to the jury to determine the proper amount of corrective

16   advertising damages. <u>See</u> Ninth Cir. Model Jury Instr. No. 15.27; <u>see</u> <u>Adray v. Adry-Mart, Inc.</u>,

17   76 F.3d 984, 989 (9th Cir. 1995), <u>as amended on denial of reh'g</u> (Feb. 15, 1996) (explaining that

18   the jury determines corrective advertising damages, which must not exceed the damage to the

19   value of the infringed mark). Other than Voth's reliance on <u>Big O</u>, Voth has identified no basis

20   as to why he believes that 25% is the correct amount to use to set corrective advertising in this

21   specific case. And the Ninth Circuit has not explicitly endorsed the <u>Big O</u> standard or indicated

22   that this percentage should apply in all cases. Voth's opinion would not be helpful to the fact

23   finder, as he bases his opinion on out-of-circuit law, not a personal assessment of the facts at

24   issue here. The Court GRANTS the Motion as to this portion of Voth's opinion.

### c. Goodwill and trademark valuation

During Voth's deposition, he offered the opinion of another individual to opine on the valuation of Plaintiff's trademark and goodwill. This was not disclosed with Voth's report and it was not timely provided. Although Plaintiff claims this issue is not ripe, the Court finds no reason why it should wait to exclude this opinion. The opinion was not properly disclosed and Voth cannot introduce it. The Court GRANTS the Motion as to this opinion.

### 2. Vanderhart

Plaintiff moves to exclude the opinions of Defendants' damages expert, Jennifer Vanderhart, Ph.D.

First, Plaintiff argues that she improperly deducted the cost of goods from the gross profit margin of the infringing goods. But whether or not this deduction is proper goes to the weight of her opinion, not her methodology. Plaintiff cites to no accounting rule or principle that Vanderhart violated. The Court DENIES the Motion as to this opinion.

Second, Plaintiff moves to exclude Vanderhart's deduction of sales post-Alludo rebrand to existing customers. Plaintiff's complaint here is as to Defendants' categorization of the various customers and whether they predate the rebrand. But the Court sees no reason why Vanderhart could not rely on this information, which was kept in the ordinary course of business and is seemingly reliable. Plaintiff is free to attack the underlying data, but the opinion appears presentable and within the scope of Vanderhart's expertise. The Court DENIES the Motion as to this opinion.

Third, Plaintiff argues that Vanderhart should not have deducted from revenues any sales to non-educational customers. As with Plaintiff's other criticisms, this does not identify a flawed methodology requiring exclusion. It is a dispute over what the relevant inputs are into

1    Vanderhart's calculations. This goes to the weight of the opinion, not its admissibility. The Court

2    DENIES the Motion as to this opinion.

3         Fourth, Plaintiff argues that Vanderhart improperly made deductions based on Steckel's

4    determination that few people are familiar with Plaintiff's brand. The Court agrees with this

5    criticism. Vanderhart has failed to explain why a brand recognition survey would be a reliable

6    means of apportioning sales that are linked to the infringement. Without this linkage, the opinion

7    itself lacks reliability and is quite likely to mislead and be potentially prejudicial to the jury. This

8    is particularly the case where there is no link between the survey and any sales data. And

9    Defendants could not identify any appellate decision embracing this apportionment

10   methodology. The Court therefore GRANTS the Motion as to this opinion.

11       **3.    Roos**

12        Defendants seek to exclude the opinions of Jason Roos, Ph.D., who provides criticisms of

13   the surveys prepared by Steckel, Kivetz, and Parikh. Defendants argue that Roos has no

14   familiarity with trademark disputes, the likelihood of confusion, and has never run any survey as

15   the three defense experts have here. Plaintiff argues that these criticisms overlook the fact that

16   Roos has conducted marketing surveys and has an extensive educational and teaching pedigree.

17   (Pl. Op. at 4.) The Court agrees and finds that Roos may provide his opinions. He has experience

18   conducting surveys and creating representative samples, all of which qualifies him as an expert

19   on the survey issues presented. The fact that Roos has not worked on a trademark case is not

20   fatal, particularly since this is the first time he has worked as an expert. The Court DENIES the

21   Motion on this issue.

22        Defendants also seek to exclude Roos' statement that there is a high likelihood of reverse

23   and forward confusion, an opinion they believe exceeds the scope of his rebuttal. But as Plaintiff

24

notes, Roos is not offering an opinion on whether there is reverse or forward confusion. Given Plaintiff's representation, Roos may not offer an opinion on reverse or forward confusion. On this limited basis the Court GRANTS the Motion.

## CONCLUSION

Disputes of material fact preclude entry of summary judgment for either party on Plaintiff's claims. The <u>Sleekcraft</u> factors do not break decisively in either Party's favor. On the one hand, Defendants' use of an identical mark has led to confusion of consumers and non-consumers alike. But on the other hand, the degree of the confusion remains hotly contested particularly in light of the differences in the products and the nature of the target consumers. A jury must determine whether there is a likelihood of confusion and whether Plaintiff can succeed on their trademark and related claims. The Court therefore DENIES the Motions for Summary Judgment.

And while the Court finds that the Parties' experts can present their opinions to the jury, the Court excludes the limited opinions identified above from Voth, Roos, and Vanderhart. The Court therefore: (1) DENIES Plaintiff's Motion to Exclude Kivetz and Parikh (Dkt. No. 77); (2) GRANTS in part and DENIES in part Plaintiff's Motion to Exclude Vanderhart and Steckel (Dkt. No. 72); (3) GRANTS in part and DENIES in part Defendants' Motion to Exclude Roos (Dkt. No. 92); and (4) GRANTS in part and DENIES in part Defendants' Motion to Exclude Voth (Dkt. No. 58).

The clerk is ordered to provide copies of this order to all counsel.

Dated March 6, 2025.

Marsha J. Pechman
United States Senior District Judge